TEMPLE COTTON OIL COMPANY *v.* SOUTHERN COTTON OIL COMPANY.

Opinion delivered March 12, 1928.

1. WORDS AND PHRASES—"SOAP STOCK."—"Soap stock," in the business of refining cottonseed oil, is the resultant product of the treatment of crude cottonseed oil with caustic soda solution.

2. WORDS AND PHRASES—REFINING LOSS.—The refining loss is the difference between the weight of the crude cottonseed oil and the weight of the refined oil produced therefrom.

3. WORDS AND PHRASES—CRUDE COTTONSEED OIL.—Crude cottonseed oil is the mill run oil pressed from cottonseed.

4.  WORDS AND PHRASES—PRIME COTTONSEED OIL.—Prime cottonseed oil is pressed from sound decorticated seed, sweet in flavor and odor, free from water and settlings, and, when refined, produces prime summer yellow oil with a loss in weight not exceeding 9 per cent.

5.  CONTRACTS—INTENTION OF PARTIES.—One of the principal rules in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles.

6.  CONTRACTS—CONSTRUCTION OF PARTIES.—In the interpretation of contracts the construction the parties themselves have placed on the contract is entitled to great weight.

7.  CUSTOMS AND USAGES—CONSTRUCTION OF CONTRACT.—Local usages and customs of trade will not defeat the express terms of a contract, and the course of dealing between parties under similar circumstances cannot be invoked as a waiver of an express and unambiguous stipulation in a new contract.

8.  COMPROMISE AND SETTLEMENT—CONCLUSIVENESS OF SETTLEMENT.—When a complete settlement is made according to usage or custom or according to the terms of a contract, so far as that particular contract is concerned, no right of action thereafter exists in favor of either party.

9.  COMPROMISE AND SETTLEMENT—EFFECT OF SETTLEMENT.—In all contracts where the terms are ambiguous, or where there is a dispute about its terms, a complete settlement between the parties is binding on them.

10. COMPROMISE AND SETTLEMENT—CONCLUSIVENESS OF SETTLEMENT.—The seller of crude cottonseed oil is not entitled to recover from the buyer the value of excess soap stock, in view of complete settlement between the parties after each shipment of oil and failure of the seller to present any such claim at the time of such settlements.

Appeal from Miller Chancery Court; *C. E. Johnson,* Chancellor; affirmed.

*Jones & Jones,* for appellant.

*James D. Head, Dufour, Rosen & Kammer* and *Rose, Hemingway, Cantrell & Loughborough,* for appellee.

MEHAFFY, J. The Temple Cotton Oil Company brought fourteen suits against the Southern Cotton Oil Company, in the circuit court of Miller County. These suits were consolidated, by order of the circuit court, and transferred to equity, over the objection of appellant.

Appellant owned and operated cottonseed-oil mills at Little Rock, Arkadelphia, Hope and Ashdown, in Arkansas, and at these mills it crushed cottonseed and produced cottonseed oil, which it sold through brokers to cottonseed-oil refineries. Appellee owned and operated cottonseed-oil refineries, one of which was located at Gretna, in the State of Louisiana, and bought cottonseed oil from appellant. During the season of 1925-26 appellant sold and delivered to appellee 72 tanks of cottonseed oil, delivered to appellee in its tanks at appellant's oil mills.

These suits were brought by appellant to recover from appellee the value of soap stock carried in the crude oil sold by appellant to appellee. Soap stock is the resultant product of the treatment of crude cottonseed oil with caustic soda solution in the process of refining. Refining loss is the difference between the weight of the crude cottonseed oil and the weight of the refined oil produced therefrom. The weight of the soap stock is the weight of refining loss plus the weight of the caustic soda solution used in refining crude oil. The fatty acid content of the refining loss runs from 90 per cent. to 98 per cent. The fatty acid content of the soap stock is reduced to about 50 per cent. by the addition of the caustic soda solution used in refining the crude oil.

The contracts of sale under which the crude oil was sold and delivered by appellant to appellee were all made subject to the rules of the Interstate Cottonseed Crushers' Association. Rule No. 142 of that association, which was made part of the contract of sale, provides for the payment of the value of the excess soap stock. These suits were brought to recover the value of the excess soap stock derived from refining the crude oil sold by appellant to appellee.

The 14 suits at law involved $30,710.72. All of these contracts sued on were made through brokers, except the contract upon which suit No. 2810 is brought, which contract is for five tank cars alleged to contain soap stock of the value of $2,387.39.

The total number of contracts involved in the suits is 26, of which 18 were made through Zimmerman-Alderson-Carr, brokers, Memphis, Tennessee, covering 55 tank cars, of which 45 contained crude oil with excess refining loss, and it is alleged that the value of the soap stock in these 45 cars is $22,441.28. Four contracts were made through T. W. Brode, broker, Memphis, Tennessee, covering 13 tank cars, of which 11 contained crude oil with excess refining loss, and the value of the soap stock in those 11 cars is alleged to be $5,052.06. Four contracts of date in February, 1924, were made through Young Commission Company, brokers, Memphis, Tennessee, covering 8 tank cars, 6 of which contained crude oil with excess refining loss of the alleged value of $829.99. All of the contracts, except the four made through Young Commission Company, were entered into and all shipments made thereunder during the season of 1925-26.

The following is a copy of one of the contracts made through Young Commission Company:

"Young Commission Company

"Duplicate           No. M-2513

"Exhibit A

"Memphis, Tenn., January 9, 1924.

"Seller: Temple Cotton Oil Company, Hope, Arkansas.

"Buyer: The Southern Cotton Oil Company, New York, New York.

"Dear sir: We confirm transaction today for your account as follows:

"Quantity two (2) tanks, sixty thousand (60,000) pounds each. Commodity cottonseed oil.

"Quality basis prime crude flag settlement.

"Price nine and three-quarters (9¾) cents per pound f. o. b. cars.

"Seller's mill, Ashdown, Arkansas.

"Shipment last half January, 1924.

"Terms: Sight draft, B/L attached, free of exchange to buyer.

"Rules Interstate Cottonseed Crushers' Association.

"Brokerage 13½c per barrel.  To be paid by seller.

"Young Commission Company
"By W. S. Battaile.

"Seller's acceptance

"Date

"Seller:  Temple Cotton Oil Co.  By F. O. Collman, general manager.

"Buyer's acceptance

"Date

"Buyer:  The Southern Cotton Oil Co. by M. W. Lyons."

Eighteen contracts were made through brokers, Zimmerman-Alderson-Carr Company, and the following is a copy of one of them:

"Zimmerman-Alderson-Carr Company
Cotton Exchange
"Memphis, Tenn., Oct. 15, 1925.

"Ex. A. Number M-3350.

"Temple Cotton Oil Company, seller.

"The Southern Cotton Oil Company, buyer.

"Gentlemen:  Per our exchange of telegrams and telephone conversations between Temple Cotton Oil Company of Little Rock, Arkansas, and the Southern Cotton Oil Company of New Orleans, Louisiana, and ourselves, we beg to confirm having this day sold to the Southern Cotton Oil Company for the account of Temple Cotton Oil Company

"Five (5) tank cars, 60,000 lb. each, basis.

"Prime crude cottonseed oil, all at eight and three-quarters (8¾) cents per pound f. o. b. buyers' tank cars, Little Rock, Arkansas.

"Shipment, first half November, 1925.

"Exchange free to buyer.

"Terms:  Weight and quality guaranteed at destination.  Sight draft bill lading attached.  Sale made subject to the rules of Interstate Cottonseed Crushers' Association.

"In case oil is off, settlement as described under the word 'Flag' in Yopp's cipher code to govern.

"Commission to be paid by seller, namely, 13 1/3c per barrel of 400 lb.

> "Yours very truly,
> > "Zimmerson-Alderson-Carr Company
> > > "As brokers only.
> > > > "Battaile.

"Accepted: Temple Cotton Oil Company, W. H. Doflin.

"M-3350

"Accepted: The Southern Cotton Oil Company.

> > "M. W. Lyons."

(On back): "Received, Temple Cotton Oil Co., Oct. 16, 1925, North Little Rock mill."

Crude cottonseed oil is the mill-run oil pressed from cottonseed. To be prime it must be pressed from sound decorticated seed, sweet in flavor and odor, free from water and settlings, and when refined produce prime summer yellow oil with a loss in weight not exceeding 9 per cent. If the loss in weight is greater, but it would still make prime summer yellow oil, it may not be rejected, but shall be reduced in price by a corresponding per cent. of the contract price of the oil.

Yopp's Cipher Code is a book got out in several editions by W. I. Yopp, to facilitate trading in cottonseed oil products.

When the cars were shipped under contracts extending from January 9, 1924, until February 4, 1926, the appellant would load the tank-car at one of its mills, take a sample of the oil in it, and have it analyzed. When shipped to appellee, appellant would draw a draft on appellee with bill of lading attached for the total or approximate total value of the car, based on the contract price for prime crude cottonseed oil, according to its weight and analysis at the point of shipment Appellee paid each draft immediately on presentation. When each car reached appellee, it would be reweighed, and a sample of the oil would be taken and analyzed, and the amount of

deductions from the contract price according to the settlement terms in Yopp's Code, under the proper code word, would be arrived at and communicated to appellant. Appellant would either agree by wire to the settlement at a reduction of the contract price, or request two outside chemists to make other analysis. The parties would then settle on the analysis of the two chemists. The car was held on the track at its destination until settlement was agreed on, and no attempt made to unload it until the settlement was agreed on. When this settlement was reached, the car would be unloaded into the refinery, and the contents put in vats with the contents from other cars. When settlement was made, appellee would send appellant a statement of account on that car and close the transaction on that car with a draft on appellant if the balance was in favor of appellee, or a check to appellant if the balance was in favor of appellant.

The last contracts in suit were made on February 5, 1926, and the last settlement, March 26, 1926, for about $970, which appellant promptly paid. No claim was made by appellant and nothing said about any claim for soap stock until about the middle of May, 1926.

The abstracts and briefs in this case are very large and the testimony voluminous, but the principal question involved is the meaning of the contract, especially with reference to soap stock.

It is contended by the appellant that, under the contracts, the appellee was under obligation to pay for soap stock, because they say- that the clause in the contract, ''sale made subject to the rules of Interstate Cottonseed Crushers' Association,'' requires a settlement to be made under rule 142 of the said Interstate Cottonseed Crushers' Association, which reads as follows:

''Where a claim is made for excess loss in the refining of oil, the value of the excess soap stock, less any additional cost of handling such oil, shall be taken into consideration in settlement between parties at interest.''

A great deal of the testimony is given by experts, and is technical and conflicting. One of the principal

rules in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, if it can be done consistently with legal principles. This may be said to be the principal rule, because parties should be bound for what they intended to be bound for, and should not be bound for a thing that they did not intend to be bound for. And courts will always hold the parties bound according to their intention, if that intention can be ascertained. Of course courts, in arriving at the intention of the parties, do so when it can be done from the contract itself. In other words, the court undertakes to find out what was meant by the language used in the contract.

"The intention of the parties, which courts seek to discover in giving construction to a contract, is to be gathered, not from particular words and phrases, but from the whole context of the agreement. In fact, it may be said to be a settled rule in the construction of contracts that the interpretation must be upon the entire instrument, and not merely on disjointed or particular parts of it. The whole context is to be considered in ascertaining the intention of the parties, even though the immediate object of inquiry is the meaning of an isolated clause. Every word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the courts can discover any reasonable purpose thereof which can be gathered from the whole instrument. The contract must be viewed from beginning to end, and all its terms must pass in review; for one clause may modify, limit, or illuminate the other. Taking its words in their ordinary and usual meaning, no substantive clause must be allowed to perish by construction, unless insurmountable obstacles stand in the way of any other course. Seeming contradictions must be harmonized, if that course is reasonably possible. Each of its provisions must be considered in connection with the others, and, if possible, effect must be given to all. A construction which entirely neutralizes one provision should not be adopted if the contract is susceptible

of another which gives effect to all of its provisions. The courts will look to the entire instrument, and, if possible, give such construction that each clause shall have some effect and perform some office. Likewise, where a contract as a whole discloses a given intention, they will be construed, if possible, so as to be consistent with the general intent." 6 R. C. L. 837.

Another important and well established rule in the interpretation of contracts is that the construction the parties themselves place upon the contract is entitled to great weight.

"In fact, where, from the terms of the contract, or the language employed, a question of doubtful construction arises, and it appears that the parties themselves have practically interpreted their contract, the courts will generally follow that practical construction. It is to be assumed that parties to a contract know best what was meant by its terms, and are the least liable to be mistaken as to its intention; that each party is alert to protect his own interests and to insist on his rights, and that whatever is done by the parties during the period of the performance of the contract is done under its terms as they understood and intended it should be. Parties are far less liable to have been mistaken as to the meaning of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have impelled them to resort to law, and one of them then seeks a construction at variance with the practical construction they have placed upon it of what was intended by its provisions. It has even been said that the practical construction of the ambiguous terms of a contract will be adopted, although the language used may more strongly suggest another construction." 6 R. C. L. 853; *Gauss* v. *Orr*, 46 Ark. 129; *Keopple* v. *National Wagon Stock Co.*, 104 Ark. 466, 149 S. W. 75; *Ins. Co.* v. *Dutcher*, 95 U. S. 269, 24 L. ed. 410.

The parties to these contracts were the buyer and seller. The seller would ship the cottonseed oil and draw

a draft with bill of lading attached for the estimated value of the car when it reached its destination. The amount of the draft was for the approximate value of the car, based on the contract price for the article purchased, according to its weight and analysis at the point of shipment. The purchaser would pay the draft drawn by the seller immediately on presentation. But, when the car reached the buyer, it would be reweighed, a sample of the oil analyzed, and from that it would be determined what amount of deduction, if any, from the contract price should be made. The purchaser would immediately communicate with the seller, and they would agree on a reduction of the contract price according to the figures of the purchaser, or, if the seller was not satisfied, an analysis would be made by two outside chemists. The parties would then settle according to this analysis. The car was held on the track at its destination until a settlement was agreed on. In some instances the seller would have to send check to the buyer in settlement. In other instances the purchaser would have to pay a certain sum to the seller. In other words, at the time of the shipment a draft was made for what the seller assumed to be its approximate value. If the analysis at destination was different from that at the place of origin, the difference would be agreed to, and one would make payment to the other in settlement of the matter.

It is earnestly contended by the appellant that local usages and customs of trade cannot be invoked to defeat the express terms of the contract, and also that the course of conduct under similar contracts cannot be invoked as a waiver of an express and unambiguous stipulation in a new contract.

Appellant is correct in its contention that the local usages and customs of trade will not defeat the express terms of a contract, and that a course of dealing between the parties under similar contracts cannot be invoked as a waiver of an express and unambiguous stipulation in a new contract. But we do not have that situation in this

case. The authorities cited by appellant in support of this contention undoubtedly contain correct statements of the law. But they differ from the contracts in this case at least in this particular. In the instant case there was a settlement, and we think a complete settlement for each car. And it is not contended that a settlement for one car, according to custom and usage, would bind the parties in a new contract if the seller, in making the new contract, had stated that he would not be bound by custom or usage, or that he expected to insist on the terms of the contract. If such notice were given, and the contract was unambiguous, the parties would have a right to insist on the terms of the contract, although the custom and usage might be different. But, when a complete settlement is made according to usage or custom, or according to the terms of the contract so far as that particular contract is concerned, no right of action would thereafter exist in favor of either party. But, in all contracts where the terms are ambiguous or where there is a dispute about the terms of the contract, a complete settlement between the parties is binding on the parties.

It is the contention of the appellant that, when a claim is made for excess loss in refining of oil, the value of the excess soap stock, less any additional cost of handling such oil, shall be taken into consideration in settlement by the parties in interest. This is the rule of the Interstate Cottonseed Crushers' Association, relied on by appellant as a basis for its cause of action. In the first place, if a settlement is made as was made in these contracts, and nothing said about pay for excess soap stock or additional cost of handling, there is no claim by either party because of additional cost of handling or because of excess soap stock. And certainly it cannot be said that the value of the excess soap stock, less any additional cost of handling, was not taken into consideration. The very fact that the parties settled, and that nothing was claimed until after all of the contracts had been settled, is a circumstance tending to show that these things were taken into consideration and

that the settlement was final. And, while the authorities referred to by appellant hold that local usages and customs cannot defeat the express terms of a contract, these authorities also hold that the usage may be resorted to to explain the meaning of a commercial term, although it can never be received to contradict the express terms of a contract nor to give words a meaning different from their settled legal interpretation.

There is no charge of any mistake or fraud, duress or coercion, but the parties themselves settled, drew drafts and gave checks in settlement, evidently taking into consideration everything that they regarded as necessary to a complete settlement of the contract. And when parties have settled under such circumstances, the settlement is binding on the parties. The parties had a right, even if the contract was not ambiguous, to make any settlement satisfactory to themselves. They had a right to make such settlement, although it might not be according to the terms of the original contract. They had as much right to do this as they did to make the original contract.

"Persons competent to contract can as validly agree to rescind a contract already made as they could agree to make it originally. However, as a contract is made by the joint will of two parties, it can be rescinded only by the joint will of the two parties. It is obvious that one of the parties can no more rescind the contract, without the other's express or implied assent, than he alone can make it. But, if the parties agree to rescind the contract, and each one give up the provisions for his benefit, the mutual assent is complete, and the parties are then competent to make any new contract that may suit them." 6 R. C. L. 921.

There was a settlement for the first shipment in these cases in 1924. No suggestion was made that the settlement was not complete until after the last shipment, which was many months after the settlement for the first shipment. There is no better rule for ascertaining the intention of a party in a contract than the rule that the

construction the parties themselves have placed on the contract shall be considered.

Having reached the conclusion that there was a settlement by agreement of parties at the time of each shipment, it becomes unnecessary to decide the other questions discussed by learned counsel. The judgment of the lower court is correct, and is therefore affirmed.