LOVELESS *v.* DIEHL.

5-2841                                    364 S. W. 2d 317

Supplemental Opinion on rehearing delivered
February 18, 1963.

*Rolland A. Bradley,* for appellant.

*Robert W. Henry,* for appellee.

George Rose Smith, J., on rehearing. This is an appeal by the sellers from a decree directing specific performance of a contract for the sale of land. In our original opinion, in the belief that we were achieving substantial justice, we set aside the chancellor's award of specific performance and instead limited the purchasers to their monetary damages, which we fixed as the difference between the contract price and the slightly greater sum for which the purchasers had agreed to sell the property to a third person, 235 Ark. 805.

This possibility of substituting damages for specific performance was not mentioned in the original briefs. In their petition for rehearing the appellees earnestly insist that our decision did not in fact reach a completely just result. Briefing the legal point for the first time, counsel contend that the court's denial of specific performance is not warranted in the circumstances of this case.

After reconsidering the question we have concluded that the petition for rehearing is well-founded.

Our prior decisions recognize the possibility that in a few unusual situations a court of equity may in its discretion deny the plaintiff the right of specific performance. But the remedy of specific performance, in giving the complaining party exactly what he bargained for, ordinarily affords complete and perfect relief and therefore is usually to be awarded *as a matter of course.*

The point was discussed in *Sims* v. *Best,* 140 Ark. 384, 215 S. W. 519, where we said: "Finally, it is insisted that the right to specific performance is not absolute, but is a matter of discretion with the chancellor. While this is true, the discretion is a sound judicial discretion, controlled by established principles of equity, and where the contract is in writing, is certain in its terms, is for a valu-

able consideration, is fair and just in all its provisions, and is capable of being enforced without hardship to either party, *it is as much a matter of course for a court of equity to decree its specific performance* as for a court of law to award a judgment of damages for its breach." (Italics added.) It will be noted that every one of the conditions just mentioned (a written contract, certainty, etc.) is present in the case at bar.

Much to the same effect is this holding in *Dollar* v. *Knight*, 145 Ark. 522, 224 S. W. 983: "Where land or any estate or interest in land is the subject-matter of the agreement, the jurisdiction to enforce specific performance is undisputed, and does not depend upon the inadequacy of the remedy in the particular case. It is as much *a matter of course* for courts of equity to decree a specific performance of a contract for the conveyance of real estate, which is in its nature unobjectionable, as it is for courts of law to give damages for its breach." (Italics added.)

In the present case we find no valid reason for a denial of specific performance. To the contrary, the equities in the case strongly demand that this remedy be afforded. The purchasers, according to the great weight of the evidence, expended some $5,000 or more, in money or in labor, in improving the property. Apparently the land in its improved state is worth more than the contract price, for otherwise the sellers would hardly be so strenuously resisting this suit for enforcement of the agreement. To deny specific performance, and to award instead an amount of damages far below the buyers' expenditures in improving the property, would result in the sellers' being unjustly enriched for their culpable refusal to carry out their promise.

The only reason that occurs to us for a denial of specific performance is the fact that the buyers entered into an agreement to sell the land to Dr. Hart. It is plain enough, however, that they had a perfect right to resell the land if they wanted to. Whether they kept it, sold it, or gave it away was of no concern to the sellers. To

refuse specific relief on account of the proposed resale would establish an unsound precedent, diminishing the transferability of property, since in similar situations prospective buyers would be reluctant to bind themselves to a purchase contract, for fear that it might prove to be unenforceable.

Now that the appellees' right to specific performance has been reinstated there remain three issues which were argued in the original briefs but which we did not find it necessary to decide in our original opinion.

First, the appellants insist that the purchasers are not entitled to prevail, for the reason that they failed to make a physical tender of $21,000 in cash within the period allowed for the exercise of their option to buy the property.

This argument fails to distinguish the two meanings which the term tender may have. When a duty of performance rests upon only one of the contracting parties, as in the case of an open account or promissory note, an actual offer of the money owed is essential to a valid tender. But the law is otherwise when both parties are under a duty to perform, and the question is whether one of them has made a sufficient offer of performance to put the other in default. Williston discusses this distinction clearly and accurately:

"It is said that the strict rules of tender are not applicable to a conditional offer to perform a concurrent condition; that what is essential is that it shall appear to the court and shall have been made clear to the other party to the contract that the exchange agreed upon would be carried out immediately if the latter would do his part. This requirement involves both ability on the part of the plaintiff to perform and an indication of that ability to the other party. The actual production of the money or other thing which the plaintiff is to give is said to be unnecessary.

"As the courts have said 'the word "tender," as used in connection with such a transaction, does not mean

the same thing as when used with reference to the offer to pay money where it is absolutely due, but only a readiness and willingness to perform in case of the concurrent performance by the other party, with present ability to do so, and notice to the other party of such readiness.' " Williston on Contracts (3d Ed.), § 833.

Diehl testified that about two weeks before the expiration of his lease he told Loveless that he was exercising his option to purchase, that he had a man who was ready to pay for the property, and that he wanted a deed. Loveless promised to execute the deed and voluntarily added that the Federal Land Bank had a loan against the land and that he would get the abstract of title from the Land Bank so that it could be examined. Thereafter Loveless failed to make any move toward carrying out his agreement to sell, and as soon as the time expired he refused to consider the matter further. At no time during the life of the option did Loveless either demand or put himself in a position to demand that the purchase money be physically tendered. The chancellor's finding that the purchasers made a sufficient offer of performance is not against the preponderance of the evidence.

Secondly, the appellants contend that the chancellor should not have charged them with $2,600 as the rental value of the land, at the rate of $100 a month, during the period between the expiration of the lease and the entry of the decree. The complaint was filed sixteen days after the termination of the lease and of course did not contain a prayer for rents, as none had then accrued. The undisputed proof showed that the land was rented for $100 a month both under the Loveless-Diehl lease and thereafter, and, further, that this was the fair rental value of the property. When the chancellor entered his decree 26 months after the inception of the controversy he treated the complaint as having been amended to conform to the proof and awarded the buyers a judgment for the rental value of the land.

The court was right in charging the sellers with the rental value of the land while they were in possession, but he should have gone farther and charged the purchasers with interest at the legal rate upon the unpaid purchase price during the same period. The two charges are equitably offsetting and should go together. The sellers are charged with the rental value because they have had the use of the buyers' land, and the buyers are charged with interest because they have had the use of the sellers' money. Both charges are ordinarily made in situations where the creditor, such as a mortgagee, for example, has been in possession of the debtor's property. *Holcomb* v. *Bowe,* 154 Ark. 543, 243 S. W. 803; *Hamner* v. *Starling,* 189 Ark. 948, 50 S. W. 2d 615; *Zini* v. *First Nat. Bk.,* 228 Ark. 325, 307 S. W. 2d 874; Hughes, Arkansas Mortgages, §§ 521 and 525. To make either charge without the other is evidently unwarranted, for it gives the favored party the use of both the land and the money. On this point the decree must be modified to require the purchasers to pay interest upon the purchase price and to require the sellers to pay interest upon each monthly installment of rent from its accrual.

Finally, by cross appeal the Diehls contend that the Lovelesses waived their right to collect the milking equipment note by repossessing that property. We think the chancellor was right in holding that the repossession was merely incidental to the sellers' action in taking control of the farm as a whole and so did not amount to a waiver of their right to enforce the note. Inasmuch as the purchasers had been deprived of the use of their property the chancellor absolved them from payment of interest upon the note, which we think to be a proper balancing of the equities. When the purchasers obtain specific performance of the contract they will be entitled to the milking equipment and will be under a duty to pay for it.

The decree is modified as indicated, and the cause is remanded so that the account may be stated in accordance with this opinion and a final decree be entered.

Johnson, J., not participating.

HARRIS, C. J., and McFADDIN, J., dissent.

CARLETON HARRIS, Chief Justice (dissenting). I originally voted to reverse this case because of the fact that, in my opinion, no proper tender of the $21,000.00 was made to Loveless by Diehl, or anyone in the latter's behalf. However, with the same feeling as that expressed in the present majority opinion (the belief that we were achieving substantial justice), I joined in the original opinion handed down by this court.

It is true that the substitution of damages for specific performance was not argued in the original briefs; however, the complaint filed by appellees, after asking for specific performance, prays, in the alternative, for damages.

I am still of the view that no proper tender was made and I think this true even under the discussion by Williston, quoted by the majority. A portion of that quotation reads as follows:

" 'As the courts have said "the word 'tender,' as used in connection with such a transaction, does not mean the same thing as when used with reference to the offer to pay money where it is absolutely due, but only a readiness and willingness to perform in case of the concurrent performance by the other party, *with present ability to do so*,[1] and notice to the other party of such readiness." ' "

I cannot ascertain from the record that either Diehl or Dr. Hart had the "present ability" to make the payment of $21,000.00. In fact, there is no contention that Diehl was able to make the payment himself, but he testified, as stated by the majority, that "he had a man who was ready to pay for the property." This, of course, was a reference to Dr. Hart. Let us, therefore, examine the record for the purpose of determining Hart's ability to pay that amount.

Dr. Hart first testified that he could have raised the money "in a matter of 48 hours." But he then became more specific in his testimony as follows:

---

[1] Emphasis supplied.

"You were talking about whether I had the money. I had some money available. I had some property both in Kansas and in Arkansas and I was wanting to use this property in Arkansas as collateral and had hoped to borrow enough money locally with this collateral, which was a three hundred acre farm in Conway County, to purchase the lands here locally without having to jeopardize the business venture in Kansas. I would rather have had that locally. I had talked to the bank, The First State Bank, Mr. Tom Wilson and he had approved a loan of $10,000.00 to me if I needed it and I asked several people. I had talked with Mr. Atchison about it. I had done some banking with both banks and I talked to him about it to see what he thought and, of course, we discussed the value of the real estate, whether it was worth so much money. Then, I went over to see Mr. Ligon. I've had some experience with Federal Land Bank in Kansas and familiar, more or less, with their interest rates and I was asking Mr. Jimmy Ligon about the possibility if they would like to finance it and he told me that it might be valuable for me to contact Mr. Loveless and talk with him; that he was of the opinion *that Mr. Loveless, possibly, would carry part of the note;*[2] that he might be interested in carrying part of the note for me to purchase the property from Mr. Diehl and that was the reason that I went to see Mr. Loveless."

Further, from Dr. Hart's testimony:

"Q. All right. Now, have you at all times since then been ready, willing and able to go on and purchase it if — at the price you agreed on then?

A. Yes, sir, I have.

Q. You are willing and able now?

A. Yes, sir.

Q. *Within a reasonable time, perhaps a very few days,*[3] you can raise the money and pay Mr. Diehl so he can pay Mr. Loveless in cash?

---

[2] Emphasis supplied.
[3] Emphasis supplied.

A. That's correct. Yes, sir.''

The transcript reflects the following testimony by Mrs. M. Coburn, a real estate broker, with whom the property had been listed for sale:

''Q. Now, did you ever have any conversation with Dr. Hart that was here on the stand about the purchase of the place?

A. Yes. Dr. Hart came to my office with —. It was along about Thanksgiving and they wanted to know if the place was listed and I told them we had it listed and he said he would like to buy the place and I thought we were going to perhaps negotiate a deal for it, but he mentioned that he had to —. I mentioned that the way it was set up, it would have to be all cash *and he said he could raise the all cash, but he'd have to sell some property or make arrangements on other property*[4] and that he was going back to Kansas and that he would see us a little later. Well, I tried repeatedly to call him on the phone and I never could get him and I didn't know what happened to him and I heard later that he was trying to buy it through Speaker, so I don't know if that was a true rumor or not.''

Dr. Hart denied the pertinent statements of this particular conversation, but, to me, his own testimony is sufficient to establish that he did not have $21,000.00 in cash ready for payment to Loveless before December 15, 1959. Under the contract, Diehl had until that date to exercise his option. Loveless testified that Dr. Hart talked with him on December 12 or 13 and discussed buying the place by paying $7,000.00 down, and the balance on terms, but no agreement was reached. Hart did not again talk with Loveless about purchasing the property until *after* the lease agreement (and option) had expired. Dr. Hart likewise testified that he did not talk with Loveless the second time until December 16.

The majority state,

---

[4] Emphasis supplied.

"The purchasers, according to the great weight of the evidence, expended some $5,000 or more, in money or in labor, in improving the property. Apparently the land in its improved state is worth more than the contract price, for otherwise the sellers would hardly be so strenuously resisting this suit for enforcement of the agreement. To deny specific performance, and to award instead an amount of damages far below the buyers' expenditures in improving the property, would result in the sellers' being unjustly enriched for their culpable refusal to carry out their promise."

I should like to point out that Diehl, entirely voluntarily, wanted to sell this property to Dr. Hart for $22,-000.00, which means, according to the majority statement just quoted, that he would lose $4,000.00 by making the sale. In other words, since he was willing to lose $4,000.00 (if he expended $5,000.00 on the place) there certainly was no reason for this court to go beyond the figure that he was willing to accept himself. Diehl was willing to accept $1,000 more than his purchase price, which was the amount of damages we awarded him. Nor can I see that specific performance is called for either legally or equitably, when the sole beneficiary of this holding by the court will be Dr. Hart, a rank outsider — who never had a contract — who was not a party to the litigation — who suffered no loss — and who, according to my view, never did tender to Loveless the $21,000.00 in cash.

I, therefore, respectfully dissent to the granting of the rehearing.

Ed. F. McFaddin, Associate Justice (dissenting). I dissent from the opinion of this Court granting a rehearing; and stoutly maintain that the opinion of December 3, 1962, was correct and should stand. In that opinion there was this language:

"Under the situation as it existed in December 1959, the judgment of $1,000.00 gives the Diehls all the relief that a deed from the Lovelesses would have given them. The Diehls admitted that they could not have purchased

the property except by obtaining the money through resale to Dr. Hart. He was ready, able, and willing to purchase in December 1959, but was not bound to do so thereafter. Furthermore, the Diehls prayed for damages in the alternative to specific performance, and we conclude that the amount of $1,000.00 is the amount of damages they established in connection with the option to purchase; and this conclusion eliminates any rental claims of the Diehls after December 15, 1959. In thus awarding the clearly established damages in lieu of specific performance, we are exercising the sound discretion which a court of equity has in cases involving specific performance. Such discretion has been recognized in: *Orr* v. *Orr,* 206 Ark. 844, 177 S. W. 2d 915; *Cole* v. *Salyers,* 190 Ark. 53, 76 S. W. 2d 669; and *Simms* v. *Best,* 140 Ark. 384, 215 S. W. 519. See also *Jamison Coal Co.* v. *Goltra* (8th Cir.), 143 F. 2d 889; 154 A. L. R. 1191; and see also 49 Am. Jur. p. 13 *et seq.,* 'Specific Performance' § 8 and § 9.''

The present opinion granting the rehearing uses this language:

''Our prior decisions recognize the possibility that in a few unusual situations a court of equity may in its discretion deny the plaintiff the right of specific performance. But the remedy of specific performance, in giving the complaining party exactly what he bargained for, ordinarily affords complete and perfect relief and therefore is usually to be awarded *as a matter of course.''*

The opinion quotes from *Simms* v. *Best,* 140 Ark. 384, 215 S. W. 519, and *Dollar* v. *Knight,* 145 Ark. 522, 224 S. W. 983, following the above quoted language. But the opinion on rehearing fails to quote this language from *Dollar* v. *Knight:*

''It is allowable in the exercise of a sound discretion to deny specific performance 'where the case is not clear, or where the complainant is in the wrong, or there are considerable countervailing equities.' *Watkins* v. *Turner, supra.''*

The case at bar comes within the last quotation from *Dollar* v. *Knight*, because (a) the case is not clear; and (b) there are considerable countervailing equities. The dissenting opinion of the Chief Justice in this case shows that it is not entirely clear that the Diehls made a sufficient tender of any kind; and there are certainly countervailing equities because the sum of $1,000.00 is all that the Diehls would have gained if they had received the deed under the contract; and to grant them judgment for that amount is to end the litigation. In *Watkins* v. *Turner*, 34 Ark. 663, Judge Eakin denied specific performance because the case was not clear.

Furthermore, I desire to make reference to the case of *Cole* v. *Salyers*, 190 Ark. 53, 76 S. W. 2d 669, which is more recent than any of the cases cited in the opinion that is granting a rehearing. Cole brought suit for specific performance; there was uncertainty as to the power of the agent to give time for Cole to act. In denying specific performance because of such uncertainty, this Court used this language:

" 'Courts of equity have always reserved the right of exercising a sound discretion in suits for specific performance and generally refuse relief where the case is not clear, or where the complainant is in the wrong, or there are considerable countervailing equities. In such cases equity refuses to interfere, and leaves the parties to their rights and remedies at law.' *Watkins* v. *Turner*, 34 Ark. 663; *Smith* v. *Price*, 125 Ark. 589, 189 S. W. 167; *Dollar* v. *Knight*, 145 Ark. 522, 224 S. W. 983.''

Also in *Cole* v. *Salyers*, Cole as plaintiff had, as an alternative to specific performance, prayed for damages. This Court refused damages, not because of the absence of the right of specific performance, but because no damages were shown. The Court said:

"The appellant asked in the alternative, in the event he should not be able to procure specific performance, that he have damages. The proof indicates that, under the prevailing conditions, the value of the property was not substantially in excess of $900. That being true, there

could be no damages, even if there were a breach of contract."

The plaintiffs' prayer to the complaint in the case at bar was in this language:

"WHEREFORE, Plaintiffs pray that defendants be required to specifically perform said lease agreement and the option therein contained, and that plaintiffs be adjudged to be entitled to conveyance of said lands from defendants; that, in the alternative, defendants be required to reimburse plaintiffs for expenditures made by plaintiffs in making permanent improvements to and upon said lands in the sum of $7,000.00, and for judgment against defendants for breach of contract in the sum of $2,000.00; for the costs herein, and for all other relief to which they may be entitled."

When the plaintiffs prayed for damages as an alternative to specific performance, the court of equity has the right to decide whether to award specific performance or damages; certainly when the case is not clear and when there are countervailing equities, as in the case at bar. Without prolonging this dissent, it is sufficient to say that I stoutly maintain that the opinion of December 3, 1962 reached a practical result in giving the Diehls $1,000.00 as damages, which is all they would have received if the deed had been delivered to them; and the opinion of December 3, 1962, therefore, would have ended the litigation. Now the majority is continuing the litigation by remanding it for further consideration by the Chancery Court.

Original opinion delivered Dec. 3, 1962 (235 Ark. 805).