OWEN *v.* MERTS

5-3931                                        405 S. W. 2d 273

Opinion delivered June 6, 1966
[Rehearing denied July 25, 1966.]

*Carlton Currie,* for appellant.

*Gregory & Claycomb,* for appellee.

HUGH M. BLAND, Justice. This is a suit for specific performance of a contract to sell shares of stock in the Pine Bluff National Bank and involves the construction of a mutual stock option contract containing a stock restriction on the shares issued to the organizing parties.

In July of 1964 twelve individuals decided to organize the Pine Bluff National Bank. To effectuate the organization these twelve persons, together with the President and Vice President, entered into an agreement entitled "Mutual Stock Option" set out verbatim as follows:

"To assure continuity of responsibility, to prevent domination of Pine Bluff National Bank by any other bank, institution or venture through stock acquisition, and to assure that substantial stock ownership will remain in persons devoted to growth and development of said Bank and not as a speculative venture, the Organizers of said Bank have entered into this Mutual Option agreement. The shares of stock set aside for management shall also be under the terms of this Mutual Stock Option with the same rights as the Organizers of said Bank.

Said Organizers and management are hereinafter referred to as Organization Group. In the event that any member of the Organizational Group within a period of five years from date of charter of said Bank desires to sell his shares of stock of Pine Bluff National Bank, such shares shall first be offered to the remaining members of such Organizational Group at its book value at the time of such offer. Notice of such offer shall be sent by certified mail to the President and to the Cashier of said Bank. Said Organizational Group shall have thirty days from receipt of such notice within which to make payment for the shares of stock so offered, and if such payment is not made within such thirty days,

the offeror shall be released from this option as to such stock offered. Book value shall be taken as of the most recent determination by said Bank of such book value.

The considerations for this agreement are the mutual options and the fact that members of said Organizational Group have been permitted to purchase more stock of said Bank than made available to other persons.

Upon exercise of such option, the remaining members of such Organizational Group may exercise such option pro rata in equal shares.

Devolution of such shares upon death shall not be treated as a "sale" of such stock, but the successor in interest of any such decedent shall be bound hereby."

In this action the appellants and appellees constitute the Organizational Group as defined in the Option Contract.

The bank had only been open a few months when some discord developed among the organizers, the end result being that the Organizing Group developed into two factions. Subsequently ten parties holding shares subject to the Option Contract, properly following the requirements set out in the Option Contract, offered to sell their shares. At a meeting held June 17, 1965 eight of the letter offers were communicated to the parties. After each offer was read a motion was made by another offerer and seconded by a third offerer that the offer to sell be rejected. All of the other offerers voted to reject the offer. This same procedure was followed for all eight offers and all eight were rejected. Four parties at the meeting, appellants here and plaintiffs below, objected to the voting procedure, did not take part in the voting, and stated they reserved their rights under the Option Contract.

On July 2, 1965 the final two offers were communi-

cated to the Organizational Group and the same procedure was followed that occurred at the June 17th meeting. On the same day the last two offers were voted on and rejected the appellants gave all but one offerer a letter of acceptance. A letter of acceptance was sent by certified mail to the remaining offerer. The letters of acceptance suggested that delivery of the stock and payment therefor be made at Pine Bluff National Bank on July 9, 1965 at 10 A.M. Appellants went to the Bank on July 9th to pay for and take delivery of the shares. Some of the appellees were present but refused to deliver; others did not appear at the Bank. None of the shares in controversy have been delivered or paid for.

Appellants filed an action for specific performance under the terms of the Option Contract, also asking for damages for delay in delivery of the shares of stock.

The chancellor held that the offers did not constitute "one" offer on the part of the defendants (appellees) as the Option Agreement specifically provided for a sale of stock by "a member" of the Organizational Group. The fact that some of the offers were made on the same date (but not all of them) would not constitute one offer. The chancellor further held that even if there were concerted action this would not constitute "one" offer.

The chancellor laid particular stress on that part of the Option Agreement that stated the shares shall first be offered to the "remaining members of such Organizational Group." After stating that the decisive question was: "Who has the right to exercise the option for the purchase of the offered shares of stock?", the chancellor answered this question by holding that the option could be exercised only by the remaining members of the Organizational Group and that the option contemplated group action rather than individual action. This being so, the chancellor held there were only two methods by which the option could be exercised, i.e., by the unanimous or majority action of the remaining mem-

bers. Since the remaining majority elected not to exercise the offers, the chancellor held that the offered shares of stock were free of the restrictions of the Option Agreement, except that the minority might insist that the stock not be sold to another bank, institution, or venture whose plans are to dominate the bank and that the stock be sold to persons devoted to the growth of the bank. The court further held that the 1,500 shares set aside for the management (president and vice president) of the bank should be under the terms of the Stock Option with the same rights as the organizers of the bank; that if the holders of this stock were to be a part of management of the bank, they were duty bound to offer their shares of stock to the Organizational Group for reassignment to the succeeding president and vice president. The chancellor later clarified this part of his opinion by holding that the present president and vice president have the right to sell their stock free of the terms of the Option Agreement so long as they are a part of management of the bank, but that if either of them should terminate with the bank, not having previously in good faith disposed of his stock before that time, he could not carry those shares of stock with him.

The chancellor also held that the Stock Option was not, as defendants (appellees herein) contended, a joint adventure because it did not have as its purpose the making of a profit by its signatories.

For reversal the appellants rely upon seven points:

1. The Stock Option is a Contract. The appellees agree with this contention.

2. Rights under a multi-party contract are (1) joint, (2) several, or (3) joint and several. Appellants' main point here is that the chancellor based his opinion on the theory of "majority and minority" rights which might be proper if the Stock Option were a joint adventure, but the chancellor held that the Stock Option was not a joint adventure and, therefore, majority or

minority rights have no bearing on the Stock Option Contract.

3. Rights to Purchase under the Stock Option are ''Several Rights.'' Appellants contend that the right to purchase under the Stock Option is several, separate and distinct, and could be exercised by any party to the contract. They point out that the real objection to majority rights is that while it took fourteen parties to make a contract which was to last for five years, seven or more parties are now given the right to terminate the contract six months after it became effective.

4. The practical construction of the contract by the parties was that the right to purchase is a several right. Appellants contend that the practical construction came about in this way:

The first cashier of the bank, Nipper, resigned and went to another bank in April of 1965. His successor was Kirkland, an appellee. Nipper owned 500 shares of stock in the bank subject to the Option Contract when he left the bank. Nipper wanted to sell and Kirkland to buy Nipper's 500 shares. Since Nipper's shares were subject to the option restriction, an offer to sell the shares by Nipper would give the remaining parties a right to buy their pro rata part of the shares. Thus, in order to effect a transfer of the shares from Nipper to Kirkland it became necessary for the parties themselves to reach a practical construction of the Stock Option. To effect this transfer all the parties (except one who had died) signed an instrument entitled Limited Waiver of Mutual Stock Option. Under this instrument Kirkland received Nipper's 500 shares of stock without the option rights of a member of the Organizational Group, but subject to the stock restriction. Appellants contend that by the execution of this instrument all the parties agreed that the right to purchase shares under the option could not be waived without the consent of all the parties to it.

5. The offers to sell were accepted and tender of payment made. Refusal of tender placed each individual appellee in default. Appellants contend that it was not necessary for them to make a physical tender of the cash, but it was sufficient if they were ready, able and willing to perform.

6. Appellants are entitled to specific performance of the contracts to sell the offered shares of stock. Appellants contend that the shares offered are unique, not readily available on the market, and will give appellants effective working control of the bank.

7. Appellants are entitled to damages for delay in delivery of the shares. Appellants claim that between the time they accepted appellees' offers and appellees' refusal to deliver, the book value of the stock declined and that they are entitled to the difference between the book value of the stock as of July 9, 1965 and as of the date of actual delivery.

Appellants and appellees agree that the Stock Option is a contract. In the interpretation of contracts, the rule is to ascertain the intention of the parties and to give effect to that intention where this can be done consistently with legal principles. *Sydeman Brothers, Inc.* v. *Whitlow,* 186 Ark. 937, 56 S. W. 2d 1020; *Sternberg* v. *Snow King Baking Powder Company,* 186 Ark. 1161, 57 S. W. 2d 1057; *Dewey Portland Cement Company* v. *Benton County Lumber Company,* 187 Ark. 917, 63 S. W. 2d 649.

In the case of *Sternberg* v. *Snow King Baking Powder Company, supra,* this court said:

"In determining the meaning of a contract, the court must look at the whole contract and ascertain what the parties did thereunder and how they construed the contract."

This court, in *Temple Cotton Oil Company* v. *Southern*

*Cotton Oil Co.,* 176 Ark. 601, 3 S. W. 2d 673, quoting from 6 R.C.L. 837, at page 608 said:

"The intention of the parties, which courts seek to discover in giving construction to a contract, is to be gathered, not from particular words and phrases, but from the whole context of the agreement. In fact, it may be said to be a settled rule in the construction of contracts that the interpretation must be upon the entire instrument, and not merely on disjointed or particular parts of it. The whole context is to be considered in ascertaining the intention of the parties, even though the immediate object of inquiry is the meaning of an isolated clause. Every word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the courts can discover any reasonable purpose thereof which can be gathered from the whole instrument. The contract must be viewed from beginning to end, and all its terms must pass in review; for one clause may modify, limit, or illuminate the other. Taking its words in their ordinary and usual meaning, no substantive clause must be allowed to perish by construction, unless insurmountable obstacles stand in the way of any other course. Seeming contradictions must be harmonized, if that course is reasonably possible. Each of its provisions must be considered in connection with the others, and, if possible, effect must be given to all. A construction which entirely neutralizes one provision should not be adopted if the contract is susceptible of another which gives effect to all of its provisions. The courts will look to the entire instrument, and, if possible, give such construction that each clause shall have some effect and perform some office. Likewise, where a contract as a whole discloses a given intention, they will be construed, if possible, so as to be consistent with the general intent."

See, also, *Webster* v. *Telle*, 176 Ark. 1149, 6 S. W. 2d 28.

The Stock Option contract was introduced in evidence. Its terms are plain and unambiguous. The first paragraph of this contract shows that it was the intention of the parties to prevent domination of the Bank by any other bank, institution or venture through stock acquisition, reserving substantial stock ownership in the organizers. The shares of stock set aside for management were placed under the terms of this mutual option agreement. Specific provision was made for the sale of shares of stock. Any organizer desiring to sell his stock, within five years from date of charter of said Bank, was to first offer such shares to the remaining members of the Organizational Group at its book value at the time of such offer, notice to be sent by certified mail to the President and to the Cashier of said Bank. The Organizational Group was to have thirty days from receipt of such notice within which to make payment for the stock so offered, and if such payment is not made within the thirty days, the offerer would be released from the option as to the shares offered.

The consideration for this agreement is the mutual option and the fact that members of said Organizational Group have been permitted to purchase more stock of said Bank than was made available to other persons.

Appellees contend that the letter of acceptance of the offers was conditional and that the tender itself was not complete citing *Smith* v. *School District No. 89 of Crawford County,* 187 Ark. 405, 59 S. W. 2d 1022, and a number of cases following the holding in the above case. We have carefully examined these cases and find that the fact situation is not the same and we believe that the holding of this court in *Byford* v. *Gates Bros. Lumber Co.,* 216 Ark. 400, 225 S. W. 2d 929, is more applicable to the facts in this case. In that case the court held that the offerer's acceptance is not conditional merely because it cites terms which in any event would be implied from the original offer. It must be borne in mind that both the offer and the acceptance were made under the terms and conditions of the original Stock

Option Agreement which provided that the price of the stock was to be fixed at book value and appellants adding to the letter of acceptance a paragraph stating, "We reserve any rights which we may have against the president and director certifying as to the book value of such stock," did not attach any new conditions to the contract but made the offer and acceptance more explicit in view of the terms of the Stock Option Contract.

The tender, under the circumstances of this case, was complete. In Williston on Contracts (3rd Ed.), § 833, it is said:

> "What Amounts to an Offer To Perform. It is said that the strict rules of tender are not applicable to a conditional offer to perform a concurrent condition; that what is essential is that it shall appear to the court and shall have been made clear to the other party to the contract that the exchange agreed upon would be carried out immediately if the latter would do his part. This requirement involves both ability on the part of the plaintiff to perform and an indication of that ability to the other party. The actual production of the money or other thing which the plaintiff is to give is said to be unnecessary.

> As the courts have said 'the word "tender," as used in connection with such a transaction, does not mean the same thing as when used with reference to the offer to pay money where it is absolutely due, but only a readiness and willingness to perform in case of the concurrent performance by the other party, with present ability to do so, and notice to the other party of such readiness.' "

See, also, *Loveless* v. *Diehl,* 236 Ark. 129, 364 S. W. 2d 317.

Appellees contend that the court was correct in holding the option could be exercised only by the remaining members of the Organizational Group and that the

option contemplated group action rather than individual action. Appellees further contend that since the remaining majority elected not to accept the offers, the offered shares of stock were free of the restriction of the Option Agreement. With these contentions we cannot agree. The stock held by each of the organizers was personal property. Ark. Stat. Ann. § 67-318 (Repl. 1966). The owners of this stock had a right to dispose of it in any manner they saw fit, the same as any other personal property, so long as they complied with the terms of the Stock Option Contract. The undisputed facts are that ten of the original Organizational Group offered their stock for sale in the manner and under the terms and conditions of the Stock Option Agreement. Within the time set out in said agreement the appellants accepted this offer under the terms of said agreement. The only practical construction that could be placed on the terms of this agreement is that when the offer for the sale of stock was made by the ten members, the "remaining group," constituting the appellants, had an individual right to exercise their option to purchase.

The chancellor held that in order to effectuate the sale of the stock it required a majority of the parties to accept any offer and that less than a majority could not accept. With this holding we cannot agree. To so hold would require writing into the option contract a provision that is not there. Courts will not rewrite contracts for the parties. *McLeod* v. *Meyer,* 237 Ark. 173, 372 S. W. 2d 220, 223.

The parties themselves placed a practical construction on the option contract when all parties to the original contract, except Brown who had died on June 15th and Nipper who was selling the stock, signed the Limited Waiver permitting a transfer from Nipper to Kirkland. In the interpretation of contracts the construction the parties themselves have placed on the contract is entitled to great weight. *Temple Cotton Oil Company* v. *Southern Cotton Oil Company, supra.* This practical construction by the parties is given great weight in our holding that the right to purchase is a several right.

The courts have uniformly held that shares of stock not readily procurable, as here, are subject to a suit for specific performance. 49 Am. Jur., Specific Performance, § 131, and cases cited therein. See, also, 130 A.L.R. 920.

In the case of *Fanney* v. *Virginia Investment & Mortgage Corp.*, 107 S. E. 2d 414 *(Va.* 1959) *the court* said:

> "On the other hand, a court of equity will, in a proper case, decree specific performance of a contract for the exchange of stock. It is generally held that where, as here, the stock is not readily purchaseable in the market and its pecuniary value is uncertain and not easily ascertainable, specific performance of a contract for its sale or exchange will be enforced. See *Kennerly* v. *Columbia Chemical Corp., supra,* 137 Va. at page 245, 119 S. E. 265; 17 Mich. Jur., Specific Performance, § 70, p. 107; 49 Am. Jur., Specific Performance, § 131, p. 154. This is especially true where, as is the case here, the purpose of the contract is to prevent the control of the corporation by antagonistic interests. 49 Am. Jur., Specific Performance, § 132, pp. 155, 156."

In a supplement to the complaint appellants seek damages for delay in delivery of the stock. Appellants' offer to purchase on June 9, 1965 was rejected and they contend the stock has declined in value and, therefore, they are entitled to the difference of the book value as of that date and the date of actual delivery. This contention is grounded upon the claim that they (appellants) were in essence the equitable owners of the stock as of the date it should have been transferred to them.

The general rule is that one cannot recover both specific performance and damages. 81 C.J.S., Specific Performance, § 162. In *Virginia Public Service Company* v. *Steindler,* 187 S. E. 353 (Va. 1936) the Virginia

Supreme Court had before it an analogous situation and the court there said:

"The question for decision may be thus put: Is the holder of a certificate of stock, who elects to sue in equity to compel the transfer of the stock to his name, after receiving the same together with all dividends accumulated during the controversy, with interest thereon, and after selling the stock pending the litigation, entitled to recover of the corporation damages measured by the decline in the market value of the stock between the date the transfer should have been made and when it was actually made, when such decline was due to no fault of the corporation?

Although the question is not free from difficulty, we think it must be answered in the negative."

The court then went on to note that upon refusal of the corporation to issue the new stock certificate in the purchaser's name he then had the option to either seek damages or the specific performance from the corporation to transfer the stock. Then the Court noted that the claimants were not entitled to the damages claimed, stating:

"By their form of action the complainants have insisted that they were the equitable owners of the stock as of the date it should have been transferred to them. They have demanded that they be clothed with all of the incidents of ownership as of that date, and on this theory they have obtained the transfer, and have collected all dividends on the stock, with interest. They have thus obtained every right which a stockholder had as of the desired time. But one of the incidents of ownership of property, which complainants overlook, is that the property is subject to depreciation as well as appreciation in value. This is a risk which every owner of property assumes. It is a risk which the complainants took

when they asked that they be placed in the position of owners of the stock as of August, 1931.''

In the case at bar it was not alleged or shown that the decline in book value of the stock was due to the fault of the offerers and we, therefore, hold that the appellants are not entitled to any damages by reason of the delay in delivery of the stock.

In view of our holding in this case we deem it unnecessary to discuss the merits of the cross-appeal which is hereby dismissed.

Reversed and remanded with directions to enter a decree not inconsistent with this opinion.

HARRIS, C. J., not participating.