George R. NEWBERRY et al *v.*
Ben M. McCLAREN et ux

78-161                                    575 S.W. 2d 438

Opinion delivered December 18, 1978
(In Banc)
[Rehearing denied January 29, 1979.]

736

*John I. Purtle,* for appellants.

*Clark & McNeil,* for appellees.

Frank Holt, Justice. The appellants leased 1,120 acres of land for $3,000 annually to the appellees. The term of the written lease was from May 1, 1971, to December 31, 1975.

The agreement gave the appellees the option to purchase the acreage at $200 an acre within a period of not less than thirty days and not more than ninety days before the end of the lease. Appellees properly exercised this option. Thereupon the appellants brought an action to rescind the agreement alleging various breaches by the appellees. The appellees denied the allegations and counterclaimed for specific performance. The chancellor dismissed appellants' complaint and awarded appellees specific performance of the option to purchase, subject, however, to a year's extension of appellants' right to cut and remove timber from the property. For reversal of that decree, appellants first assert that the court erred in finding that appellees did not breach the contract by interfering with appellants' reservation of a right to remove timber.

We will not disturb the chancellor's findings on a fact issue unless it is clearly against the preponderance of the evidence. *Gibson* v. *Heiman,* 261 Ark. 236, 547 S.W. 2d 111 (1977); *Walker* v. *Walker,* 262 Ark. 648, 559 S.W. 2d 716 (1978). Here appellants reserved the right to sell timber from the leased property for sawlogs or pulpwood during the term of the lease. In 1973, appellants and appellees discussed appellees' purchasing timber from appellants. After those discussions fell through, appellants entered into two contracts for the sale and removal of the timber. Appellants first contracted in February, 1975, with a Mr. Shamblin. According to Shamblin, he ceased his operations because, in April, 1975, appellants made a similar contract with another logging contractor named O'Bannon. O'Bannon testified that the road known as the "lane road" was the only road that he was to use and that he did use that road for six or seven weeks, quitting when it became impassable. It was taking more time to fix the road than he could manage. Price, an adjoining landowner, testified that O'Bannon's heavy equipment was the cause of the road's becoming impassable. O'Bannon then attempted to use another road, the "loghouse road," for access to the timber. However, the appellees, after observing the damages caused by the use of this road, instructed O'Bannon to use only the "lane road." O'Bannon's equipment consisted of two-ton trucks, skidders weighing twelve tons each and a D-6 bulldozer. It appears undisputed that O'Bannon, besides damaging both roads, cut and broke

fences and left logs and tree tops in appellees' fields. In these circumstances, we cannot say that appellees' insistence that O'Bannon use the "lane road" for access to the timber constituted a material breach of contract. Appellants' right to sell and remove timber did not give them the right to allow their logging contractor to unreasonably damage the leased farm. Certainly it cannot be said that the chancellor's finding is against the preponderance of the evidence.

Appellants next assert that the court erred in finding appellees made a proper tender to exercise the option to purchase. They argue that, although no specific finding of a legally sufficient tender was made by the court, the court's ruling inferred there was a sufficient tender. Appellees exercised their option on October 24, 1975. It is insisted that it was impossible for them to exercise their option to purchase on this date because they never had under their control sufficient funds to meet their contractual obligations. However, the contract itself makes no requirement that a tender of funds be made upon exercising the option. It does require that upon appellants' receipt of notice of the option to purchase, they "shall cause an abstract of title covering said lands to be prepared and submitted to" appellees for their approval and "at such time as said title is rendered marketable [appellants] shall tender unto [appellees] a warranty deed." With respect to payment, the contract provides that "25 percent of the said purchase price shall be paid cash in hand upon delivery of deed" and the balance "shall be evidenced by a promissory note of even date" bearing a stated interest payable in five equal annual payments.

Where a contract does not provide that a tender be made when the option is exercised, it is unnecessary to make a tender at that time. *Rich* v. *Rosenthal*, 223 Ark. 791, 268 S.W. 2d 884 (1954). Here, as indicated, the contract did not require a tender upon exercising the option to purchase. It only provides that upon appellees exercising their option the appellants would furnish them a marketable abstract of title. In view of this provision, it cannot be said that the parties contemplated a tender of the agreed purchase price by the appellees before they had an opportunity to examine the abstract as to the marketability of the title. It was only upon appellants' delivery of the deed with a marketable title, which

appellants have never done, that the appellees were required to fulfill the purchase price agreement. In the circumstances, whether the appellees had or did not have the "present ability" to make payment of the purchase price at the time they exercised their option to purchase is of no significance. Therefore, we find no merit in appellants' contention that the chancellor erred in his finding that the appellees made proper tender upon exercising their option.

Next it is contended that the chancellor's finding that appellees did not breach the contract by failing to use good husbandry in caring for the farm was against the preponderance of the evidence. The thrust of appellants' argument is there were violations of good husbandry with respect to soil erosion, permitting the growth of brush too large to bush hog and dead cattle left on the lands to decay. In Underhill, Law of Landlord and Tenant, §§ 461 et seq., it is noted that persons living in the area who are familiar with local cultivation practices and climate may give their opinion as to what constitutes good husbandry. It appears appellees leased the farm primarily to raise cattle. According to appellants, the appellees have never bush hogged the property sufficiently and underbrush has grown too large to bush hog. For the first two years, however, appellees did well as far as good husbandry techniques. Price, a neighbor, testified that he had seen five dead cows on appellees' property during the five year term of the lease, and some of the land had grown up beyong the point where it could be bush hogged. However, he considered the property as being in better shape at the end of the lease than at the beginning since appellees had built ponds and fencing, cleared fields and improved a road on the property. Two employees of appellees testified that they had worked regularly for a year clearing, building sheds and fences and making other improvements. McClaren testified that when he leased the property in 1971 none of it was open pasture land. At the end of the lease, at least one hundred acres were pasture land. He had cleared approximately three hundred acres. He further testified, with supporting exhibits, that he had expended approximately $7,000 for fertilizer, seed and building materials, all of which were used on the property during the lease. Other improvements included building an all-weather road through the farm, fences (85 rolls of new barbed wire) and digging

four ponds, one which admittedly did not hold water. The seepage from that pond caused some erosion which he characterized as inconsiderable. According to appellants, there was erosion from two of the ponds built by appellees causing "a big wash" and some "smaller washes" in the area of one pond. As to the five dead cows, according to McClaren, there was only one carcass left of the premises and, upon discovery, he kept it disinfected by the use of concentrated creosote. Appellants acknowledged that they really never complained to appellees about the dead cattle. McClaren testified that he discussed his farming operations two or three times a year with appellants and no complaint was made by them about anything. He was complimented and told that he had exceeded their expectations in the operation of the farm. The first complaint was this action to rescind their agreement. Appellants denied they had ever expressed approval of appellees' farming operation.

In summary, suffice it to say there was conflicting testimony about the farming practices by appellees. We cannot say the chancellor's finding as to good husbandry is against the preponderance of the evidence.

It is also contended that the court erred in not finding the appellees failed to comply with the condition of no assignment. The appellants invoked paragraph 6 of the lease agreement which states that the "lease shall not be assigned, nor shall any portion of the leased premises be sublet without the written consent of the Lessor . . . " Appellees entered into a contract for the future sale of 1,000 acres of the property to a Mr. Baker and Mr. Jones on August 19, 1975, or a month and a half before the option could be exercised. The agreement expressly recognized that appellees' rights in the property existed pursuant to their purchase option contained in their lease of the lands from appellants. The buy and sell agreement obligated appellees to do everything necessary to exercise their option and to present Baker and Jones with a warranty deed to the property whenever the title was rendered marketable. As "grantees", they would have possession of the real estate not later than November 1, 1975, and of the residence not later than January 1, 1976. The appellees were advanced $20,000 in escrow by the prospective purchasers. After appellees exercised their option on October

24, 1975, they borrowed $36,000 from PCA, secured by a mortgage dated December 22, 1975, on the property, to raise the necessary balance of the required down payment. These two sums ($20,000 and $36,000) were paid into the registry of the court on December 29, 1975. The money was to be returned to the respective lenders if appellees were unable to exercise their option. Appellees' agreement to sell the property upon acquisition of it further provided that the prospective grantees would have the right to make the five annual payments due on the balance, as scheduled in the lease option agreement, directly to the appellants.

51 C.J.S. Landlord and Tenant § 37 (3) notes that the burden of proving that an assignment took place is usually on the person asserting the assignment. § 38 indicates that there must be an "actual transfer of lessee's interest" in order for an assignment to be found. Here the only restriction on assignment specifically related to the leasing or sub-letting of the property. There is nothing in the contract that prohibits the appellees from agreeing to sell the land or any part of it subsequent to appellees' acquisition. If the parties had intended such a restriction, they could easily have so provided. Here there was no assignment of the lease. Neither was there ever a transfer of possession of any of the property to the prospective buyers. Their right to eventual possession of the property was clearly subject to a contingency; i.e., appellees successfully exercising their option to purchase. In *Loveless* v. *Diehl*, 236 Ark. 129, 364 S.W. 2d 317 (1963), we said:

> The only reason that occurs to us for a denial of specific performance is the fact that the buyers entered into an agreement to sell the land to Dr. Hart. It is plain enough, however, they they had a perfect right to resell the land if they wanted to. Whether they kept it, sold it, or gave it away was of no concern to the sellers. To refuse specific relief on account of the proposed resale would establish an unsound precedent, diminishing the transferability of property . . . .

Here the court correctly found there had been no breach of the provision against assignment of the lease.

Appellees assert on cross-appeal that the court erred in

allowing appellants an additional year in which to remove timber from the property. We deem it unnecessary to discuss this contention since appellees, in oral argument, stated that this is no longer significant inasmuch as a year has almost elapsed.

Affirmed.

FOGLEMAN, J., concurs.

BYRD and HOWARD, JJ., dissent.

JOHN A. FOGLEMAN, Justice, concurring. I concur in the result. I cannot agree that the preponderance of the evidence shows that covenants that the lessee should at all times cultivate the leased lands in accordance with good husbandry and that he should do and perform every act reasonably necessary to keep erosion, and the effect thereof, at a minimum, were not broken. I feel that the preponderance of the evidence is clearly to the contrary. Building ponds, fencing and improvement of roads, and building sheds and other improvements may have increased both the market and rental value of the property but were wholly immaterial to these covenants. On the other hand, I agree with the chancellor that violation of these covenants was wholly immaterial in this case.

Appellees exercised their option to purchase. The only way that these covenants could have been material to this litigation would pertain to the status of the property as security for the deferred purchase price. Appellants never sought to terminate the lease. They only sought to rescind the option and to regain possession of the property at the expiration of the lease. One of the appellants testified that, on the day of the trial, the farm was sufficient security for the $170,-000, which is that part of the purchase price to be deferred and paid over a five year period. That appears to have been the only evidence on the subject.

I also think that the chancellor dealt properly with the removal of the timber, whether or not the cross-appeal has been abandoned.

Supplemental Opinion on Motion to Clarify
delivered January 29, 1979

FRANK HOLT, Justice. Appellants ask that our opinion be clarified to show that they have one year from the date of this opinion to remove timber from the lands.

Appellees on cross-appeal asserted that the court erred in allowing the appellants an additional year in which to remove timber from the property. As indicated, the appellants reserved their right to sell timber from the property leased by them to the appellees during the 5 year lease. Appellees agree that the chancellor's one year extension is a well fashioned relief if the appellants are entitled to any relief with respect to the removal of timber. During the 5 year lease, there were discussions between appellee McClaren and appellant George Newberry with respect to McClaren purchasing the timber from the appellants. In granting the one year extension, apparently the chancellor believed, and we cannot disagree, that McClaren agreed to Newberry's offer to sell the timber to him and then backed out of the agreement about one year later. Consequently, we think the

chancellor was correct in extending the right to remove timber an additional year. Even so, appellees argue that the one year extension is extinguished inasmuch as one year has elapsed during the appellate proceedings without a supersedeas bond staying the decree. It is true that neither party filed a supersedeas bond; however, it is appellants' position that "by apparent understanding neither party required a supersedeas bond. Each relied upon the status quo that neither would do anything pending the appeal to injure the other parties." This assertion appears to be uncontroverted. Another answer is that if the appellants had exercised their rights to remove timber during the one year extension, their direct appeal would have been subject to dismissal on the theory that they had accepted the benefits of the chancellor's decree and, therefore, waived their appeal.

Affirmed on direct and cross-appeal.

PURTLE, J., not participating.